**INDEPENDENCE FEDERAL SAVINGS BANK,**
Plaintiff,

v.

**Morton A. BENDER, et al., Defendants.**

**No. CIV.A. 04–736(RMC).**

United States District Court, District of Columbia.

July 9, 2004.

---

James H. Schropp, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, DC, for Plaintiff.

Donna S. Mangold, James E. Tompert, Dale A. Cooter, Cooter, Mangold, Tompert & Wayson, L.L.P., Washington, DC, for Defendant.

## MEMORANDUM OPINION ON APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF AGAINST "POISON PILL"

COLLYER, District Judge.

Morton and Grace Bender (the "Benders"), as joint tenants, are the beneficial owners of 326,000 shares of common stock of Independence Federal Savings Bank ("Independence" or "Bank"), and thereby own approximately 21% of the outstanding stock of the Bank. In March 2004, the Bank's Board of Directors unanimously voted to accept a bid from Carver Bancorp, Inc. ("Carver") to acquire the Bank for $21.00 cash per share. The Benders oppose the Carver acquisition. Mr. Bender wishes to increase his stock position to reduce the chance that the necessary three-quarters of outstanding shares would vote in favor of it and to improve his opportunity to change Bank personnel and policies. In response, the Board of Directors of the Bank adopted a Shareholders Rights Plan ("Rights Plan"), more commonly known as a "poison pill," that would effectively dilute the Benders' position if they purchase a single additional share.[1]

Pending before the Court is the Benders' application for a preliminary injunction to require the Bank to rescind the Rights Plan or to declare it invalid and ineffective until final approval by the Office of Thrift Supervision ("OTS"). A hearing on the application was held on

June 28, 2004, at which time both parties submitted uncontested exhibits.

## BACKGROUND FACTS

This is the second time these parties have been before the Court concerning the future direction of the Bank, which was labeled a "troubled" institution by the OTS in November 2003. Benders' Motion for Preliminary Injunction ("Motion") Exh. P. The Benders have been shareholders of the Bank since March 1999 and in October 2002 owned 5.8% of the Bank's outstanding stock. By October 2003, after a successful proxy fight, Mr. Bender had placed two of his nominees on the Board of Directors and had obtained OTS approval to buy up to 100% of the Bank's stock. He unsuccessfully sued the Bank in December 2003 to force a special shareholders meeting to remove most of the Board. *Bender v. Parks*, No. 03–2485(RMC). Since that time, the Bank completed the process of accepting bids to acquire the Bank. Mr. Bender participated in the bid process through the course of due diligence, but then declined to make an offer. After assessing the offers received with the advice of various professionals, the Board of Directors unanimously approved the Carver offer, at $21.00 cash per share, by which Independence would be merged into Carver. One of the attractions of the Carver merger is that it would continue the Bank's status as a minority bank.

After the Carver merger plan was announced, the Benders repeatedly increased their investment in the Bank and repeatedly stated, in filings with the OTS accompanying each stock purchase transaction, that they intended to oppose the

---

1. A shareholder rights plan grants identified stockholders "rights" to purchase stock at a discount—in this case, all holders of common stock *except* one who holds 20% or more of the Bank's stock without the prior consent of the Board of Directors—triggered by a specified event. Such plans are designed to dilute the shares of those behind a hostile takeover and to make a takeover attempt more difficult and expensive.

merger. *See, inter alia,* Plaintiff's Opposition to Benders' Application for Preliminary Injunctive Relief ("Opp.") Exh. 7, Amend. No. 7 to Schedule 13D, filed 4/7/04 ("Mr. Bender does not support this [Carver] transaction. At this time, he does not intend to vote his shares of Common Stock in favor of the Merger Agreement ... Mr. Bender may make additional purchases of shares of Common Stock ... in order to further increase his ownership level .... Mr. Bender intends to take action to effect [a] change in the management and directors of the [Bank], if the Merger Agreement is not approved."). Alarmed that the Carver merger was at risk, the Bank's Board of Directors, with the Bender nominees absent, voted to pursue three strategies: 1) adopt the Rights Plan; 2) institute this lawsuit against the Benders;[2] and 3) create a holding corporation over the Bank to alter the vote necessary to approve the merger from two-thirds of the shareholders to one-half. The third strategy has since been discarded.

The underlying complaint alleges that the Benders have violated Section 13(d) of the Exchange Act, breached a fiduciary duty of loyalty and conspired to breach a fiduciary duty of loyalty,[3] and tortiously interfered with business relations between the Bank and Carver. To this complaint,

the Benders filed a counterclaim, including the allegation that the adoption of the Rights Plan was invalid and in violation of OTS regulations. Although the parties have agreed to a schedule that will allow discovery and a determination of the issues by September 2004, the Benders are pursuing immediately their request that the Rights Plan be declared invalid so that they can continue to purchase Bank stock without fear of triggering dilution of their shares.

### A. The Rights Plan

The Independence Board of Directors met in a special meeting on May 4–5, 2004. Mr. Deckelbaum was not in attendance and Mr. Hall excused himself after the Chairman of the Board, Janus Parks, suggested that Mr. Hall might have a conflict of interest.[4] The perceived conflict existed between his role as part of the "Bender Group,[5]" interested in advancing Mr. Bender's interests, and the rest of the Board, interested in the Carver merger. The meeting adjourned shortly after Mr. Hall's departure, following a discussion of the Rights Plan, and was continued to the next day so that counsel for the Bank could confer with OTS. At the continuation of the meeting, the Rights Plan was discussed and approved.[6]

---

2. When filed, the lawsuit also named Nelson Deckelbaum and Elliott S. Hall, the Bender nominees to the Bank's Board, as defendants. Messrs. Deckelbaum and Hall have since been dropped from the suit.

3. These allegations are made in Count II of the complaint against all defendants but may no longer be at issue, given that allegations against Messrs. Deckelbaum and Hall have been withdrawn.

4. The agenda for this meeting did not specify that topics to be covered would include a shareholders rights plan (the so-called "poison pill") or the possibility of this lawsuit against the Benders. Bender Motion Hearing

("Bender MH") Exh. 23, Janus Parks Dep. at 188:20–190:7 (These matters were "not in specie" covered on agenda but were addressed under "recommendation of the transaction committee.").

5. Messrs. Deckelbaum and Hall were so described in various OTS filings submitted by the Benders, although those filings did *not* say that either Mr. Deckelbaum or Mr. Hall would oppose the Carver merger or vote their shares against it.

6. The Rights Plan is in the form of a Rights Agreement between the Bank and American Stock Transfer & Trust Company as Rights Agent.

The record shows that representatives from the Bank first met with OTS regulators on April 14, 2004, to discuss the possibility of the Bank adopting a shareholders rights plan. Opp. Exh. 21. By letter to OTS dated April 15, 2004, the Bank identified the authorities that supported Independence's authority to adopt a rights plan. *Id.* Further correspondence on the Rights Plan was sent to OTS on April 28, 2004. *See* Opp. Exh. 22. This letter provided a more extensive description of the Rights Plan. It concluded, "[I]f we do not hear from you to the contrary by the close of business Monday, May 3, 2004, IFSB will assume you have no objection and will proceed." *Id.* In both of these letters, the Bank took the position that OTS securities-offering regulations, 12 C.F.R. Part 563g, would not apply to require an offering circular upon adoption of a rights plan. *See id.;* Opp. Exh. 21. OTS responded that it could not be sure that its administrative process would be completed by May 3, 2004, and that the Bank could not assume its approval. *See* Bender MH Exh. 9 ("OTS cannot commit to resolving these outstanding issues within the timeframe referenced on page eight of your letter .... You will be contacting OTS Washington staff to discuss the proposals.").

Representatives from the Bank met with regulators at OTS on May 4, 2004 and, thereafter, on that date sent to OTS copies of similar rights plans previously approved by the Federal Home Loan Bank Board, the predecessor agency to OTS. *See* Opp. Exh. 23. Finally, on the morning of May 5, 2004, the Bank sent a revised Rights Plan, along with a red-lined version showing all changes, to the OTS.[7] *See* Opp Exh. 26. This revised Rights Plan was adopted by the Board of Directors in the afternoon/evening of May 5, 2004. As described by the Benders,

> The [Rights] Plan provides for the distribution of one common stock purchase right for each share of Independence common stock. The right represents the right to purchase one-tenth of a share of Independence common stock. The Plan states that "[t]he Purchase Price for each full share of Common stock [sic] pursuant to the exercise of a Right shall initially be $60." Shareholder Rights Plan at 13. A right to purchase stock cannot be exercised until a triggering event occurs, as set forth in the Plan. A triggering event occurs if a shareholder acquires twenty percent (20%) or more of the Bank's common stock. Since the Benders have already acquired more than twenty percent (20%) of the Bank's common stock, they are considered a "Grandfathered Shareholder" under the Plan, but only so long as they do not purchase any more shares than they owned as of May 5, 2004. The Merger Agreement with Carver is expressly deemed not to be a triggering event. After a triggering event occurs, each non-triggering shareholder has the right to purchase a number of common shares having a market value of twice the exercise price (which is set at $60 per share in the Plan). As such, under the terms of the Plan, if the Benders purchase one additional share of Independence common stock, a triggering event occurs, and the stock own-

---

7. Among the revisions, the revised Rights Plan would "delay the 'record date' for the dividend until the tenth business day after the Bank's announcement that it has filed a preliminary offering circular with the OTS" and the Bank would use its best efforts to file the offering circular as soon as practicable. Opp. Exh. 26 at 1. The Bank deleted one feature of the initial Rights Plan and made other changes as well, presumably at the request/demand of OTS.

ership interest of the Benders is subject to massive dilution.

Motion at 18–19; *see also* Opp. Exhs. 21, 22, 26 (Bank letters to OTS explaining the Rights Plan); Exh. 26 (Rights Plan, as adopted).

Independence issued a press release on May 6, 2004, in which it announced that the Board had adopted "a shareholder rights plan (commonly known as a 'poison pill') in order to deter abusive control tactics by shareholder Morton Bender and his affiliates, who chose not to submit a bid for Independence during the Bank's bidding process or to commence a tender offer for all shares of the Bank, and who have been accumulating shares in the open market . . . ." Bender MH Exh. 12. A copy of the press release was sent to Mr. Bender's counsel on May 6, 2004, with a cover letter warning that "any further purchases of common stock of the Bank by or on behalf of Morton Bender may result in Mr. Bender becoming an 'Acquiring Person,'" and trigger the Rights Plan. Opp. Exh. 27.

## B. *Dealings with OTS*

After adoption of the Rights Plan, the Bank continued to pursue the idea of reorganizing into a holding company structure. By letter dated June 16, 2004, OTS advised that such a reorganization would require a two-thirds vote of shareholders and not a simple majority as the Bank had anticipated. *See* Benders MH Exh. 14. That letter concluded with the following paragraph, upon which Mr. Bender puts great weight:

[W]e remind you that with respect to the Bank's Shareholders Rights Plan (Plan), the Bank has to date failed to perform all steps necessary to comply with OTS regulations to implement the Plan. Specifically, OTS staff advised the Bank and its counsel that the Plan would *NOT* be effective until all neces-

sary prerequisites, including the Bank's filing of an offering circular under 12 C.F.R. Part 563g, and OTS' declaring the offering circular effective, are completed. It is clear that the public is unaware that the Plan is not yet effective, and accordingly again, because we share your concerns regarding misperceptions on the part of the public, the Bank must immediately issue a press release stating that the Plan is not in effect until all necessary steps are taken to comply with OTS regulations.

*Id.* at 4; *see also* Benders' Notice of Filing of Additional Exhibit [same].

Pursuant to this warning from OTS, the Bank filed Amendment No. 1 to the Rights Plan on June 22, 2004. The Amendment was executed by the Bank and by American Stock Transfer & Trust Company, the Rights Agent. The Amendment was adopted to

provide that the dividend of Rights pursuant to the Rights Agreement will be payable to holders of record of common stock of the Bank as of the close of business on the tenth business day after the effective date of the Offering Circular which the Bank is required to file with the Office of Thrift Supervision.

Opp. Exh. 28 at 2. More specifically, the Amendment itself reads:

WHEREAS, the Board of Directors of the Company has authorized and declared a dividend distribution of one common stock purchase right (a "Right") for each share of Common Stock, par value $.01 per share, of the Company (the "Common Stock") outstanding at the close of business on the tenth business day following *the date on which an offering circular* filed with the [OTS] on an appropriate form under 12 C.F.R. Part 563g (the "Securities Offering Regulation") with respect to the securities purchasable upon exercise of the

Rights *is declared effective* (the "Record Date"), each Right representing the right to purchase one-tenth of a share of Common Stock . . .

*Id.* at 4 (emphasis added). A press release titled, "Independence Federal Announces Intention to File Offering Circular" was issued on June 22, 2004, and also filed with OTS. Opp. Exh. 28 at 9. The press release explained,

The offering circular relates to the Rights Agreement . . . which was entered into on May 5, 2004. IFSB also announced today that it has amended the Rights Agreement to provide that the dividend of rights pursuant to the Rights Agreement will be payable to the shareholders of record on the tenth business day following the date that the offering circular becomes effective. Shareholders of IFSB will have no rights to acquire IFSB stock and no shares may be issued by IFSB pursuant to the Rights Agreement until the offering circular is declared effective by the OTS and the rights are distributed pursuant to the terms of the Rights Agreement. An Acquiring Person (as defined in the Rights Agreement) will not be eligible to exercise such person's rights to acquire common stock in the event the rights become exercisable. The OTS has advised the Bank of its view that the Rights Agreement will not be effective until the offering circular has been declared effective. The Bank believes that the Rights Agreement is a contract [between the Bank and the Rights Agent] that was effective upon its execution on May 5, 2004 and that irrespective of any distinction in this regard, under the terms of the Rights Agreement, upon distribution of the rights as described above, such rights will be exercisable if any person has become an Acquiring Person prior to such time.

*Id.* An "Acquiring Person" is one who acquires, without prior approval of the Bank's Board of Directors, 20% or more of the Bank's stock. *See* Opp. Exh. 26, Rights Agreement at 3–5. According to the Amendment,

In the event that any person becomes an Acquiring Person, each holder of a Right generally will thereafter have the right for a 60 day period after the later of the date of such event or the Record Date (or such other longer period set by the Board of Directors) to receive upon exercise of the Right that number of shares of Common Stock (or, under certain circumstances, other securities) having an average market value during a specified time period . . . .

Opp. Exh. 28, Amendment No. 1 to Rights Agreement at 3. In other words, the shareholders of the Bank on the Record Date—the date the offering circular becomes effective after approval by OTS—will have a 60–day period from that date *or* the date someone becomes an Acquiring Person (whichever is later) to exercise a Right to purchase additional fractional shares equal to the number of shares held.

## ANALYSIS

■ In considering a request for preliminary injunctive relief, a district court must examine whether "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by an injunction." *Davenport v. Int'l Bhd. Of Teamsters*, 166 F.3d 356, 360 (D.C.Cir.1999); *see also Serono Lab. v. Shalala*, 158 F.3d 1313, 1317–1318 (D.C.Cir.1998).

■ A court balances the four factors and a particularly strong showing on one

or more can outbalance a weaker showing on another. *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C.Cir.1995); *Wash. Metro. Area Transit Comm'n v. Holiday Tours,* 559 F.2d 841, 843–45 (D.C.Cir.1977). Even in light of this balancing test, "[i]t is particularly important for the movant to demonstrate a substantial likelihood of success on the merits" in order to justify the Court intruding on the normal processes of the judicial system. *Adair v. England,* 217 F.Supp.2d 1, 5 (D.D.C.2002).

The parties have divergent legitimate views concerning the future of the Bank. After a detailed analysis with the assistance of outside advisors, the Board of Directors unanimously accepted the Carver bid to merge the Bank into Carver. Mr. Bender believes he can return better value for shareholders by changing management and the direction of the Bank without a merger at this time. He has OTS approval to buy up to 100% of the Bank's shares. *See* Bender MH Exh. 4. However, he is now stymied in his acquisition of more Bank shares because a single purchase will trigger the Rights Plan and dilute his shareholdings by giving other shareholders the "Rights" to purchase more shares and denying him (as Acquiring Person) any "Rights" to exercise. He argues that the Rights Plan is invalid because it was adopted at a meeting that two directors were wrongfully induced to not attend; there are not sufficient authorized but unissued shares of stock to implement the Rights Plan; the adoption of the Rights Plan without prior OTS approval

violates anti-takeover regulations; there is no authority permitting adoption of the Rights Plan; and adoption of the Plan is not a reasonable response to any perceived threat from the Benders.

Most of the Benders' arguments have fairly simple answers, as the record developed before the Court reveals information unknown to them at the time they filed their countersuit.

### A. *Likelihood of success on the merits.*

1. Alleged procedural infirmities with Board meeting

■ The presence or absence of Messrs. Deckelbaum and Hall at the Board meeting on May 4 and 5, 2004, at which the Rights Plan was extensively discussed and ultimately adopted, is irrelevant to the propriety of that action, as there was a quorum and a majority vote in favor, even if one assumes that each absent Board member would have opposed the Rights Plan.[8] According to Mr. Parks' uncontroverted deposition testimony, Messrs. Deckelbaum and Hall had previously recognized that their roles as Mr. Bender's nominees created the potential for conflicts of interest and each had agreed that he would withdraw from a Board meeting if appropriate. Bender MH Exh. 23, Parks Dep. at 203:3–13 ("[S]ome months prior when a situation arose Mr. Deckelbaum said if there's any time that—and they knew that there was a lack of confidence and a mistrust growing out of whatever in that board and Mr. Deckelbaum had stated to the board publicly and Mr. Hall apparently

---

8. This assumption is far from clear. Messrs. Hall and Deckelbaum voted unanimously with the rest of the Board in favor of the Carver merger and agreed as well to vote their shares in its favor. Under those circumstances they might have agreed with their fellow Board Members that the best protection to the Carver merger was a Rights Plan

to stop Mr. Bender's purchases of Bank stock. However, Mr. Bender admits that he received back-channel information on the bid price submitted by Carver, Opp., Exh. 1, Bender Dep. at 78:1–79:1, and the Board might have feared that either Mr. Hall or Mr. Deckelbaum would give advance notice to Mr. Bender of the Board's intentions.

agreed with it and that was at any point that the board felt that their participation or disclosures in their presence were so sensitive they would excuse themselves."). Mr. Hall acted in accordance with this prior understanding when he left the meeting at Mr. Parks's request. Given the tension surrounding the proposed Carver merger, Mr. Bender's public animus against that merger, and Mr. Bender's increasing acquisitions of Bank shares to avoid it—including Messrs. Hall and Deckelbaum as part of the Bender Group in each OTS filing—the Court has little doubt that all parties appreciated why Mr. Hall might absent himself. There is no reason to believe that Mr. Deckelbaum would not also have exhibited the same appreciation of the sensitivities involved, in accord with the prior understanding.

█ In addition, both Messrs. Hall and Deckelbaum received the Notice of Special Meeting of the Board of Directors that was sent to all the Directors on April 30, 2004. Benders' Brief in Further Support of Motion for Preliminary Injunction Exh. 26. This notice explicitly stated that the meeting was being held to provide "an update on the Merger and related matters." *Id.* This Notice satisfied the requirements of the Bank's bylaws. *See* Bender MH Exh. 3, IFSB Bylaws, Art. III, § 6 ("Neither the business to be transacted at, nor the purpose of, any meeting of the board of directors need be specified in the notice ... of such meetings."). The oblique nature of the Agenda for the Board meeting, which gave no explicit notice that either the Rights Plan or this lawsuit would be discussed, does not affect the legitimacy of the majority vote of a quorum of the Board after provision of notice of the meeting to all Directors and a full discussion by those Directors present.

It cannot be said that these facts support the likelihood of success on the merits.

2. Alleged insufficiency of authorized stock

No more indicative of ultimate success is the argument that the Bank has insufficient authorized but unissued stock to implement the Rights Plan. Contrary to the Benders' pre-litigation understanding, the Bank has four million authorized shares, not two million. *See* Opp. Exh. 30. Mr. Bender asserts that even if the Bank's charter authorizes four million shares, that amount is still insufficient because seven million shares are needed to implement fully the plan. However, the Rights Plan also provides that the obligation to satisfy each Right can be met with shares, cash or other securities. *See* Opp. Exh. 12 at 13–14, 20–21 (allowing use of Common Stock, cash, assets, or other securities to compensate those who exercise Rights). The Benders have not established a likelihood of success by this argument.

3. Alleged unreasonableness of Board action

█ On this record, the Court cannot find that the Board was unreasonable in adopting the Rights Plan in response to Mr. Bender's drive to acquire more Bank stock. Mr. Bender has been candid that he is against the Carver merger and will vote his shares that way. As he increased his ownership position, it would inevitably become more difficult to obtain a vote of three-quarters of the shareholders in favor of the merger. This was not a far-fetched concern: the Benders first bought Bank stock in March 1999; by April 4, 2002, they owned 268,700 shares; on April 16, 2004, they owned 293,000 shares; and on April 28, 2004, they owned 313,500 shares.[9]

9. *See* Opp. Exhs. 3, 7, 8 & 9 (Schedule 13D and Amendments filed with OTS by the Bend-

They have continued to buy Bank stock and now own 21% of the Bank's stock, at 326,000 shares. If, as the Board had unanimously voted, the Bank should be sold—and the best way to accomplish that goal is through the Carver merger—it is not unreasonable to protect that transaction from Mr. Bender's use of his minority position to kill the merger without making any acquisition bid of his own. By way of the Carver merger, Bank investors are assured of a price of $21/share in 2004; Mr. Bender's plans for the Bank would take at least 12 to 18 months for a turnaround and are less certain of result. While distasteful to the target, a poison pill is not illegal. These facts, therefore, do not suggest a likelihood of success on the merits for the Benders.

4. Alleged failure to comply with OTS regulations and lack of authority

■ The most serious challenge to the Rights Plan is the Benders' argument that it cannot be in force to limit their stock purchases until final approval by the OTS of the offering circular. It would appear that OTS was originally very much of the same opinion. Its June 16, 2004, letter to the Bank said just that: "the Plan would *NOT* be effective until all necessary prerequisites," including OTS approval of an offering circular, "are completed." Bender MH Exh. 14 at 3. By the time of the June 22, 2004, Amendment to the Rights Plan and accompanying press release—prepared in response to the June 16 letter and cleared by the OTS—the OTS position was subtly different.[10] The Amendment *changed the Record Date* but did not rescind or alter the May 5, 2004, Board

declaration of "a dividend distribution of one Right for each outstanding share of common stock" pursuant to the other terms of the Rights Plan. *See* Opp. Exh. 28, Amendment No. 1 ¶¶ 1.a, 1.c.

The purpose of the press release accompanying the Amendment was to avoid misperceptions in the marketplace. It is evidently a carefully negotiated document that shows that OTS and the Bank disagree as to the current force of the Rights Plan. The Bank informed the investing public that OTS is of the view that "the Rights Agreement will not be effective until the offering circular has been declared effective" while the Bank believes the Rights Plan is currently effective and that, "irrespective of any distinction in this regard," if a person becomes an Acquiring Person at any time, the shareholder Rights to buy more stock will be effective once the offering circular is approved. The Amendment seems to support the Bank's position, in that it allows a shareholder to exercise a Right during a 60–day period after the *later* of the dates on which (1) an Acquiring Person purchases 20% or more interest in the Bank *or* (2) the date OTS approves the offering circular (the Record Date). *See* Opp. Exh. 28, Amendment No. 1 ¶ 1.d. Thus, the Rights Plan contemplates that there might be an Acquiring Person prior to the Record Date but that shareholders would receive Rights nonetheless.

The Bank clearly developed the Rights Plan with the oversight and input of OTS. The Benders' arguments to the contrary are belied by the written record. In fact,

ers).

10. In his Supplemental Brief, Mr. Bender argues that there is no evidence that OTS had approved the press release. However, there is correspondence between the Bank and OTS reflecting OTS clearance of the press release.

*See* Opp. Exh. 52. The Bank filed the press release with OTS on June 23, 2004, *see id.* Exh. 53, and there is no evidence of any further correspondence from OTS regarding the substance of this press release.

the Rights Plan appears to have been ap-
proved by OTS, if only implicitly, pursuant
to discussions and modifications made by
the Bank at the government's behest.[11]  If
it were so clear that the Rights Plan is
*"NOT"* in effect, then it seems likely that
OTS would have treated the Rights Plan
as it treated the Bank's proposed holding
corporation and the Bank's position that it
did not need to file an offering circular at
all—OTS would have explained its own
position in detail and insisted on full com-
pliance.  That OTS was ultimately willing
to have the Bank inform the market mere-
ly that the regulators and the Bank dis-
agree on this point suggests that OTS can
preclude issuance of additional stock until
the circular is approved but cannot require
the Board to rescind or suspend the May
5, 2004, adoption of the Rights Plan.[12]

The Bank argues for just such a distinc-
tion between approval of the circular and
adoption of the poison pill plan.  The lat-
ter, it asserts, was fully within the authori-
ty of the Board of Directors after vetting
by the OTS. At the preliminary hearing,
counsel for the Bank described approval of
the offering circular as a procedural device
whereby OTS ensures that the information
available to investors is complete and accu-
rate but not a substantive review by which
OTS could refuse authority to the Bank to
issue stock to satisfy shareholder Rights.
Thus, according to the Bank, while the
Record Date is in the future, the Rights
Plan to which it pertains is in current
force.

The problem with the Bank's argument
is that it would allow a board of directors
to "adopt" a poison pill but never finalize
an offering circular to implement it.  The
pill would work by freezing any hostile
action despite the absence of a process to
distribute Rights to shareholders.  The
threat of a poison pill would be as effica-
cious in the market as the pill itself but
without the commercial risks that are at-
tendant on large increases of outstanding
stock.  In this case, the Board adopted the
Rights Plan on May 5, 2004, and has not
yet obtained OTS approval on an offering
circular.[13]  Nonetheless, the Bank has
forestalled any additional stock acquisi-
tions by the Benders in the meantime.

Ultimately, the Benders' argument is
that the Bank has violated OTS regula-
tions by adopting the Rights Plan and it
should be enjoined.  *See* Benders' Brief in
Support of Request for Expedited Oral
Hearing on the Limited Issue of the Cur-
rent Validity of the Poison Pill at 6 ("Here,
the Board did not seek such approval from
the OTS and the Benders seek an order
from this Court preliminarily enjoining the
Poison Pill from being effective on those
grounds alone—at least until such time (if
such a time comes) that OTS approves the
Pill.").  OTS does not appear to agree;  it
appears to have no objection to the Rights
Plan *per se*.  Rather, OTS appears to be of
the view that the Rights Plan is not yet
effective because the entirety of the ad-
ministrative process, including the offering
circular whereby the Rights Plan would

11.  The Court does not need to determine
whether the Rights Plan constitutes an "anti-
takeover provision" under the OTS Applica-
tions Handbook ¶ 410 at 410.2, because it
appears that OTS reviewed, critiqued, and
implicitly approved the terms of the Rights
Plan—demanding, among others, a change to
the Record Date. The Benders' argument in
this regard, and its argument that the Bank
failed to obtain OTS approval, are overcome

by the record showing considerable to-and-fro
between the Bank and OTS before the Rights
Plan was adopted.

12.  Knowing this litigation is proceeding, OTS
has chosen not to participate.

13.  The parties informed the Court that the
OTS review process for the offering circular
would take a minimum of six (6) weeks.

award Rights to shareholders, is not completed. *See* Opp. Exh. 28, June 22, 2004 Press Release. Yet it is exceedingly strange that OTS has agreed merely to state its position through the Bank's press release—and agreed that the Bank could state its contrary position in the same release—without requiring Bank action to comply with OTS's opinion. In the Court's experience and observation, this is not the way agencies enforce applicable regulatory requirements. The Court is persuaded by the entire record that it is more likely than not that the Rights Plan and its adoption by the Bank do not violate any OTS regulation or procedure.

The same factors influence the analysis of whether the Rights Plan is currently in effect. The Bank argues that the Rights Plan is a contract between the Bank and the Rights Agent that merely "requires the satisfaction of certain requirements or obligations set forth in the contract [*i.e.*, an offering circular approved by OTS] after the date the contract is entered into." Opp. at 21. The Bank offers an analogy to the acquisition of Company B by Company A through an exchange of stock of Company A; such a contract of sale would not be subject to rescission merely because it could not be finalized until Company A registered the stock to be issued. · *Id.* n. 53. While OTS might think otherwise, the agency's position and the legal basis underlying it are not clearly explained. The Court perceives a difference in substance between the OTS letter of June 16, which

was very definite in stating that the Rights Plan would not be effective until the offering circular became effective, and the June 22 press release, which stated the same OTS view but without emphasis or insistence.[14]

This Court is not a substitute for OTS. *See Pena v. Downey Sav. & Loan, Ass'n,* 929 F.Supp. 1308, 1315 (C.D.Cal.1996). The current state of the record does not admit information on the legal thinking of that agency, although the parties have scheduled depositions of OTS personnel. At this juncture of this suit, the Benders appear not likely to succeed on their claim that the Rights Plan was adopted without adequate OTS review and approval or statutory or charter authority. Their likelihood of success on the claim that the Rights Plan is not currently in effect without OTS approval of the offering circular appears a fifty-fifty proposition.

### B. · *Irreparable Harm to the Benders*

■ If the Court does not declare the Rights Plan invalid, the Benders will face an enormous risk of dilution if they buy more Bank stock or significantly increased cost if they attempt to improve their position through buying stock from other shareholders who exercised their shareholder Rights. Mr. Bender argues that the Rights Plan interferes with his ability to engage in shareholder democracy, *i.e.,* have the voting power he now holds as increased by stock he wants to buy. To

---

14. This analysis also applies to whether there is legal authority for the Board to adopt the Rights Plan. The Bank relied on Section Five of its Charter, which provides that the authorized shares "may be issued from time to time as authorized by the board of directors without the approval of its shareholders," and so informed OTS. Opp. Exh. 30. The Benders argue that there is no statutory authority and no authority in the Bank's charter for a rights plan. *See* Benders' Brief in Further Support of Their Motion for Preliminary Injunction on the Poison Pill at 14. While OTS has never explicitly agreed that Section Five authorizes the Bank to adopt the Rights Plan, it has also never stated to the Bank that the Rights Plan is impermissible. Rather, OTS has engaged in substantive discussions regarding changes it wanted in the Rights Plan. Notably, the Federal Home Loan Bank Board had also approved earlier devices.

the contrary, the Rights Plan interferes with his ability to buy stock but has no effect on his ability to vote such stock as he owns.

While the Court finds that this factor supports issuance of a preliminary injunction, there is one element that detracts from its power. Mr. Bender is not attempting to purchase 100% of the Bank's stock as OTS authorized him to do. He only wants to increase his minority position enough to fatally undermine a two-thirds shareholder vote in favor of the Carver merger, so that he can thereafter attempt to replace certain directors and officials of the Bank for his own benefit. While this may be good business, it is just business. Mr. Bender remains free to vote his shares against the merger.

### C.  *Injury to the Bank*

█ The Bank is a troubled institution that needs a course change. It went through a careful bid process and the Board unanimously determined that the Carver bid best met its needs. Mr. Bender has articulated very clear reasons why he disagrees with present management of the Bank and also the kinds of changes he would make to improve its profitability. *See generally* Opp. Exh. 1, Bender Dep. at 84–94. Nonetheless, Mr. Bender is a minority shareholder who, as he points out, has no fiduciary duty to other shareholders. The Board of Directors has such a fiduciary duty and there is no basis in this record to find that it ignored that duty when it unanimously voted to sell to Carver. It is impossible to say whether the Carver merger or control by Mr. Bender would better suit the Bank and its shareholders in the long run. What can be said now is that those with responsibility for deciding these matters have voted to sell to Carver.

This factor does not support granting the Benders a preliminary injunction.

### D.  *Public Interest*

█ The public interest is a complex part of the analysis in this case. One can assume that the long-term public interest is in a financially healthy and stable Bank. The short-term public interest lies in compliance with OTS regulations and oversight, full market information as to the risks and rewards of the options before the Bank, and a complete and fair opportunity for the Bank's shareholders to consider and vote. There is no basis on the preliminary record before the Court to undermine the Board's attempts to protect the Carver merger, which it unanimously approved. However, there is legitimate concern that the Rights Plan prevents Mr. Bender (or anyone else interested in acquiring an interest in the Bank greater than 20%) from additional stock purchases without a final and binding offering circular. This uncertainty cannot be prolonged. The Court finds that the public interest currently fails to support Mr. Bender's application for a preliminary injunction because (i) the Bank is timely undergoing the necessary administrative review of its offering circular, the requirement for which OTS only explicated by letter dated June 16, 2004, and (ii) Mr. Bender's aim is to advance a purely personal interest and not to advance more general shareholder rights. However, this factor might tip precipitously in Mr. Bender's favor should the administrative processing of the circular not be completed in short order.

### CONCLUSION

Having found that three of the four relevant factors suggest that a preliminary injunction should not issue, the Court denies the petition for an injunction without

50

prejudice. A status hearing on the petition is set for July 29, 2004, at 4 p.m.

**SO ORDERED.**