INDEPENDENCE FEDERAL
SAVINGS BANK,
Plaintiff,

v.

Morton A. BENDER, et
al., Defendants.

No. CIV.A. 04–00736(RMC).

United States District Court,
District of Columbia.

Aug. 23, 2004.

Daniel E. Loeb, James H. Schropp, Robert H. Ledig, Fried, Frank, Harris, Shriver & Jacobson, LLP, Washington, DC, for Plaintiff.

Dale A. Cooter, James E. Tompert, Cooter, Mangold, Tompert & Wayson, LLP, Washington, DC, for Defendants.

Donna S. Mangold, Cooter, Mangold, Tompert & Wayson, LLP, Washington, DC, for Defendant and Counter Claimant.

James H. Schropp, Fried, Frank, Harris, Shriver & Jacobson, LLP, Washington, DC, for Plaintiff and Counter Defendant.

**MEMORANDUM OPINION AND ORDER ON APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF RE: SECTION 13D COMPLIANCE**

COLLYER, District Judge.

The instant matter is but one part of a long-running dispute concerning the future of plaintiff Independence Federal Savings Bank ("Independence" or "Bank"), a minority-owned savings and loan institution

in Washington, D.C. *See Indep. Fed. Sav. Bank v. Bender,* 326 F.Supp.2d 36 (D.D.C. 2004); *Bender v. Parks,* No. 03–2485 (D.D.C. Jan. 15, 2004). The Bank began a slow decline after the death of its founder, William B. Fitzgerald, III. It was further shaken by alleged mismanagement in connection with financial improprieties at the Washington Teachers' Union. The widow of Mr. Fitzgerald invited defendant Morton A. Bender to consider acquiring Independence.[1]  Once his attention was drawn to the possibility, Mr. Bender began to acquire stock in the Bank and to observe its operations. He has since become an unhappy and vocal shareholder.

Savings and loan associations are regulated by the federal Office of Thrift Supervision ("OTS"), which labeled the Bank a "troubled" institution in November 2003. When he acquired five percent (5%) of its outstanding shares, Mr. Bender was required to, and did, file a report under § 13(d) of the Securities Exchange Act of 1934 ("Exchange Act"), as added by § 2 of the Williams Act, 15 U.S.C. § 78m(d). This "Schedule 13D" described his acquisition, its purpose, the source of his funds, and other mandatory details.[2] Plfs.' Exh. 3. Last winter, Mr. Bender sued the Bank's Board of Directors in an effort to force a Special Meeting of shareholders for the purpose of voting out those directors with whom he disagreed. That effort was

unsuccessful. *See Bender v. Parks,* No. 03–2485 (D.D.C. Jan. 15, 2004).

On March 15, 2004, the Board of Directors of Independence voted to accept a bid from Carver Bancorp, Inc. and Carver Federal Savings Bank (collectively, "Carver") to merge the Bank into Carver.[3] Mr. Bender thereafter began purchasing large quantities of Bank stock; in his 13D reports, he noted his disagreement with the Board's decision and his intention to vote his shares against the merger. In response, the Board of Directors adopted a Shareholder Rights Plan, also known as a "poison pill," and approved the instant lawsuit against Mr. Bender. *See Indep. Fed. Sav. Bank v. Bender,* 326 F.Supp.2d 36 (D.D.C.2004).

In its current incarnation, this dispute centers around the Bank's allegations that Mr. Bender's 13D filings were inaccurate, incomplete and misleading. By way of remedy, Independence seeks, *inter alia,* an order "neutralizing" the shares purchased by Mr. Bender since the date the Board announced the Carver merger.[4] This would cause eight percent (8 %) of the outstanding shares of the Bank, *i.e.,* those acquired by Mr. Bender after March 15, 2004, to be voted on the Carver merger question in the same proportion as all other votes.

After careful consideration of the entire record, including the testimony and de-

---

1. Although Mr. Bender owns his Independence shares jointly with his wife, and both Benders consequently are defendants in this action, "his wife never read or had any input into the contents of the Bender Group's Schedule 13D filings[.]" Mem. of Pts. & Auths. in Supp. of Plfs.' App. for Prelim. Injunc. at 2. The Court will refer only to Mr. Bender in the text of this opinion.

2. Mr. Bender filed 11 Amendments to the original 13D report.

3. Carver Bancorp, Inc. is the holding company for Carver Federal Savings Bank.

4. In its application, the Bank also asked that Mr. Bender be made to file a complete and accurate Schedule 13D and be enjoined from taking any steps to implement his plan to nominate additional directors. With respect to the latter proposed remedy, OTS has already prohibited Mr. Bender from "proposing an alternative slate of directors to serve on the Board of Independence ...." Defs.' Exh. 44.

meanor of the witnesses, the Court finds that the Bank has failed to demonstrate the necessary prerequisites for a preliminary injunction. Its application therefore will be denied.

## I. Facts

For speed and convenience, the facts are recited in numbered paragraphs. Despite the vigor of this litigation, the parties essentially agree on the material facts. Where there is a dispute, it is noted.

1. On October 16, 2002, Mr. Bender filed a Schedule 13D with OTS, disclosing ownership of 5.8% of the outstanding shares of the Bank's common stock. Plfs.' Exh. 3. This original 13D stated that the purpose in acquiring the stock was to "profit from the appreciation in the market price of the Common Stock through the assertion of shareholder rights." *Id.* at 4.

2. On December 3, 2002, Mr. Bender filed Amendment No. 2 to the Schedule 13D, disclosing that he had increased his ownership of Bank shares to 9.8%. Plfs.' Exh. 34. Amendment No. 2 also recited events concerning meetings between Mr. Bender and Bank officials, at which he expressed his views on the Bank's performance and recommended changes, and a letter Mr. Bender had sent to the Chairman of the Board on November 13, 2002, requesting a Special Meeting of shareholders for the purpose of removing four directors from the Board.

3. On January 8, 2003, Independence announced that it had retained Keefe, Bruyette & Woods, Inc. ("KBW"), an investment banking firm, to help it explore ways to enhance shareholder value.

4. On March 19, 2003, Mr. Bender proposed two nominees for the Independence Board of Directors, Elliott Hall and Nelson Deckelbaum (collectively, "Bender Nominees"). After a proxy contest, Messrs. Hall and Deckelbaum were elected to the Board at the Bank's 2003 Annual Meeting.

5. On March 21, 2003, Mr. Bender and affiliated parties, including Colombo Bancshares, Inc. ("Colombo"), a savings and loan holding company controlled by Mr. Bender, filed an application with OTS "to acquire, either individually or together, up to 100% of the outstanding common stock" of the Bank, including through a merger with Colombo. Plfs.' Exh. 37.

6. At the advice of the OTS, because he had nominated the Bender Nominees, Mr. Bender filed Amendment No. 3 to the Schedule 13D on April 15, 2003, reporting that he, his wife and Messrs. Deckelbaum and Hall had formed a Section 13(d) "Group." Plfs.' Exh. 38 at 6. Amendment No. 3 noted that "[t]he 100 shares of Common Stock beneficially owned by each of Messrs. Deckelbaum and Hall were acquired for them by Bender using Bender's personal funds." *Id.* This Amendment recited the entire history of Mr. Bender's demands on the Bank and the nominations of Messrs. Deckelbaum and Hall for the Board.

7. On October 30, 2003, Mr. Bender filed Amendment No. 4 to his Schedule 13D filing. Plfs.' Exh. 10. While recounting the background of events, Amendment No. 4 reported the OTS approval, on October 14, 2003, of his application to acquire up to 100% of the Bank's shares. It also advised that Mr. Bender had

increased his ownership interest in the Bank to 9.99% and the Group's ownership to 10.01%. *Id.* at 8. Amendment No. 4 stated that Mr. Bender had delivered a letter to the Chairman of the Bank's Board on October 27, 2003, requesting a Special Meeting of shareholders for the purpose of removing for cause five of the eight current directors. The parties acknowledge that this letter, although drafted, was never delivered and that, in this respect, Amendment No. 4 was inaccurate.

8. Amendment No. 5 was filed on November 17, 2003. Plfs.' Exh. 48. It reported Mr. Bender's acquisition of additional shares so that he personally owned 10% of the Bank's common stock. The Amendment repeated the history of Mr. Bender's disaffection with the Bank and its management, including the statement, "Accordingly, an effort was made, on November 7, 2003, to obtain the resignations of certain directors of the Issuer, which effort was unsuccessful." *Id.* at 8. This sentence was added at the request of Mr. Deckelbaum to report a motion by Mr. Hall, at a Board of Directors meeting, to have all non-Bender Nominees resign their Board positions. Mr. Deckelbaum directly contacted Silver, Freedman & Taff, L.L.P., securities lawyers for Mr. Bender who prepared the Schedule 13D and all Amendments, to inform them of this motion so that it could be included in Amendment No. 5.

9. On December 22, 2003, Mr. Bender filed Amendment No. 6. Plfs.' Exh. 39. For the first time, and on the advice of OTS, this Amendment did not recite the entire chronology but incorporated earlier Amendments by reference. The purpose of filing Amendment No. 6 was to report that Mr. Bender mailed a letter on November 10, 2003, demanding a Special Meeting of shareholders to remove for cause six of the eight current directions (all but the Bender Nominees) and that he had filed an action in D.C. Superior Court to force such a meeting. *Id.* at 7; *see also Bender v. Parks,* No. 03–2485 (D.D.C. Jan. 15, 2004). In commenting on that litigation, Amendment No. 7 stated that this Court had "indicated [at a hearing in which the Court denied the application for a temporary restraining order] that Mr. Bender, as the holder of at least 10% of the shares of the Issuer, was entitled to a special meeting separate from the annual meeting . . . ." *Id.* In addition, Amendment No. 6 stated that Mr. Bender had submitted a non-binding indication of interest with the Bank to purchase all shares and that he would, therefore, participate in an on-going due diligence process by which KBW hoped to receive acquisition bids for the Bank.

10. Thereafter, Mr. Bender learned of the Carver bid of $21 per share and declined to submit a bid for the Bank. After receiving and considering two offers, the Board of Directors unanimously voted on March 15, 2004, to accept the offer from Carver, in cash, with the merger to close by the end of 2008.

11. On April 7, 2004, Mr. Bender submitted Amendment No. 7 to his Schedule 13D filing. Plfs.' Exh. 7. This was a "Group" filing, as all

had been since Amendment No. 3.[5] Amendment No. 7 reported that "Mr Bender was unsuccessful in his attempt to hold a special meeting of shareholders of the Issuer to remove certain directors[,]" but made no other comment on the litigation he had initiated in *Bender v. Parks. Id.* at 7. Further, the Amendment disclosed that Mr. Bender had acquired 65,000 shares of Bank stock on March 29, 2004, at a per-share price of $20.78. The purpose of this acquisition was to "increase the level of Mr. Bender's voting rights" because "Mr. Bender does not support" the Carver merger and "he does not intend to vote his shares of Common Stock in favor of the Merger Agreement." *Id.*

12. For the first time, Amendment No. 7 included the paragraph:

Mr. Bender continues to believe that, if the Merger Agreement is not approved, a change in the management and composition of the board of directors of Independence is necessary. Mr. Bender intends to take action to effect such a change in the management and directors of the Issuer, if the Merger Agreement is not approved.

*Id.*

13. Pursuant to Powers of Attorney signed by Messrs. Deckelbaum and Hall and Mrs. Bender, Mr. Bender entered all signatures on Amendment No. 7 directly under the legend, "After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct." *Id.*

at 12. Such information included the statement that members of the Group "may dispose of all or all of the shares of Common Stock held by them, although they have no current intention to do so" and that "the Group members do not have any other plans or proposals [to report]." *Id.* at 7.

14. Between April 7 and 16, 2004, both Messrs. Deckelbaum and Hall, who had joined the unanimous Board vote to merge the Bank with Carver, signed agreements by which they pledged to vote their entire shares (at that point, each man held 110 shares) in favor of the merger.

15. Neither Mr. Deckelbaum nor Mr. Hall informed Mr. Bender that they (i) had voted in favor of the Carver merger as Board members, or (ii) had pledged to vote their stock in favor of the merger. Neither Mr. Deckelbaum nor Mr. Hall contacted attorneys at Silver, Freedman & Taff to notify them of these votes and intentions.

16. On April 16, 2004, Mr. Bender filed Amendment No. 8 as a Group filing, including Messrs. Deckelbaum and Hall (and Mrs. Bender) in the "Group." Plfs.' Exh. 8. As before, Mr. Bender executed the document via the Powers of Attorney. This Amendment continued to inform investors of Mr. Bender's opposition to the Carver merger. Its filing was prompted by Mr. Bender's purchase, on April 15, 2004, of 24,300 shares of Bank stock at a per-share price of $20.75.

---

5. At the preliminary injunction hearing, the Bank defined the term "Group" as two or more persons who are combined in furtherance of a common objective with respect to an issuer of shares.

17. On April 28, 2004, Mr. Bender filed Amendment No. 9 to his Schedule 13D report. Plfs.' Exh. 9. This too was a "Group" report signed solely by Mr. Bender pursuant to the Powers of Attorney. Amendment No. 9 reported that Mr. Bender had acquired 8,500 shares of Bank stock on April 26, 2004, for $20.84 per share, and 12,000 shares of Bank stock on April 27, 2004, for $20.89 per share. This Amendment continued to state that members of the Group had no current intention to sell their shares or any other plans or proposals to report.

18. At a special meeting of the Board of Directors of Independence on May 5, 2004, the Board adopted the "poison pill" and voted to initiate this lawsuit. Neither of the Bender Nominees was in attendance. Pursuant to the "poison pill," if Mr. Bender purchased a single additional share of Bank stock, all other shareholders—but not Mr. Bender—would have the right to purchase a number of shares equal to their holdings so that Mr. Bender's position would be drastically diluted. *See Indep. Fed. Sav. Bank v. Bender*, 326 F.Supp.2d 36 (D.D.C. 2004).

19. This lawsuit was filed on May 6, 2004, naming Mr. and Mrs. Bender and Messrs. Deckelbaum and Hall as defendants. The allegations against the Bender Nominees stemmed from the Bank's fear that Amendment Nos. 7, 8 & 9 indicated that those directors had rejected their votes in favor of the Carver merger and their obligations to vote their shares in favor of the merger because they were still members of the Group.

20. Mr. Bender testified without contradiction, and with the supporting testimony of Mr. Hall, that he first learned that the Bender Nominees had joined a unanimous Board vote for the Carver merger and had pledged to vote their stock in favor of the Carver merger when he saw the complaint in this action.

21. Amendment No. 10 was filed on May 24, 2004. Plfs.' Exh. 32. Two aspects of this Amendment are immediately relevant here. First, "Bender hereby clarifies that the disclosures in prior amendments about Bender and the Merger Agreement applied solely to Bender." *Id.* at 5. Second, the Amendment reported:

The parties have terminated the Joint Filing Agreement to file this Schedule 13D as a group, which was previously filed, with Joint Filer Information, in Amendment No. 6. Mrs. Bender and Messrs. Deckelbaum and Hall previously had given Mr. Bender a power of attorney to file and execute amendments to this Schedule 13D on their behalf. Messrs. Deckelbaum and Hall have subsequently revoked their powers of attorney . . . .

Messrs. Deckelbaum and Hall were Bender's nominees for election as directors at the 2003 Annual Meeting of the Issuer, were elected at that meeting and continue to serve as directors of the Issuer. They were included as part of a group with Bender because of their agreement to stand as Bender's nominees. Bender did not have and has no control, however, over how Messrs. Deckelbaum or Hall vote their personally owned shares of the Issuer's common stock or how either of them vote[s] as directors of the Issuer. Messrs. Deckelbaum and

Hall, as directors of the Issuer, voted in favor of the Merger Agreement and have executed voting agreements with Carver pursuant to which each individual has agreed to vote his 110 shares in favor of the Merger Agreement. Bender had no prior knowledge that Messrs. Deckelbaum and Hall had executed or would execute the voting agreements.

*Id.* at 6 (citations omitted).

22. By letters also dated May 24, 2003, Messrs. Hall and Deckelbaum terminated their "participation in the matters contemplated by that certain Joint Filing Agreement, dated as of December 19, 2003," and revoked their Powers of Attorney. *Id.* Exh. B.

23. The Bank thereafter dismissed all claims against Messrs. Deckelbaum and Hall.

24. Mr. Bender challenged the legality of the "poison pill." *See Indep. Fed. Sav. Bank v. Bender,* 326 F.Supp.2d 36 (D.D.C.2004). His motion to enjoin implementation of the "poison pill" until such time as OTS approves the Bank's offering circular was denied by this Court. *Id.*

25. Amendment No. 11 to the Schedule 13D was filed on July 29, 2004, for the purpose of reporting the receipt of a July 19, 2004, letter from OTS "which directly impacts Bender's ability to take some of the actions proposed in earlier amendments . . . ." Plfs.' Exh. 66 at 4. Specifically, and for reasons that are not in the record, OTS has prohibited Mr. Bender from acquiring any additional shares of the Bank or proposing a slate of directors at the anticipated annual meeting. *Id.* This prohibition will continue in effect until lifted by OTS. "Notwithstanding the prohibitions in the OTS Letter, Bender is allowed to vote all shares of the Issuer owned as of July 14, 2004 . . . ." *Id.; see also* Defs.' Exh. 44.

26. As of July 14, 2004, Mr. Bender beneficially owned 326,000 shares of the Bank, which constitutes 21% of the outstanding shares.

27. The reasons for the July 19, 2004, OTS letter to Mr. Bender are not related to any of the issues pending in this litigation. *See* Defs.' Exh. 44. Although this conclusion is challenged by the Bank and its expert witness, Rosemary Stewart, Esq., there are no facts in the record to undermine the opinion of OTS to this effect, as reflected in Defendants' Exhibit 44.

28. The Board of Directors has set the annual meeting for shareholders of the Bank for September 29, 2004. The record date for that meeting— to identify those with the right to vote through share ownership—is August 9, 2004.

29. Schedule 13D filings are available for viewing through OTS only by making a prior appointment and visiting the agency's headquarters in Washington, D.C. It may take weeks for a filing to become available to the public. Such filings relating to the Bank are posted on the Bank's website. The immediacy of availability is not revealed by the record but is faster than OTS.

## II. Analysis

Independence seeks a preliminary injunction on the grounds that Mr. Bender's Schedule 13D and Amendments failed to satisfy the disclosure requirements of

§ 13(d) of the Exchange Act. According to the Bank:

> Contrary to the requirements of that Section, he has concealed the very specific plans he has for IFSB—plans that will clearly affect the vital interests of all IFSB shareholders and the investing public generally—if he is successful in blocking the Carver transaction. In Bender's Schedule 13D, Bender hides the truth and discloses only an intention to "oppose" the Carver transaction and a vaguely expressed belief that a change in IFSB's management and directors "is necessary." The federal securities laws require much more.

Mem. of Pts. & Auths. in Supp. of Plfs.' App. for Prelim. Injunc. at 2. The Bank asserts that Mr. Bender has a secret plan to obtain control of Independence's Board, dismiss certain management personnel and replace the current auditor, change management policies and practices, and effect a "turnabout" at the Bank. *Id.* at 2–5.

In considering a request for a preliminary injunction, a court must examine whether "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction." *Serono Labs., Inc. v. Shalala,* 158 F.3d 1313, 1317–1318 (D.C.Cir.1998). "These factors interrelate on a sliding scale and must be balanced against each other." *Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356, 360–61 (D.C.Cir.1999). A particularly strong showing on one or more factors can mitigate a weaker showing on another. *City-Fed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C.Cir.1995);

*Wash. Metro. Area Transit Comm'n v. Holiday Tours,* 559 F.2d 841, 843–45 (D.C.Cir.1977). Even so, "[i]t is particularly important for the movant to demonstrate a substantial likelihood of success on the merits" before a court will interrupt the normal processes of the judicial system by ordering preliminary injunctive relief. *Adair v. England,* 217 F.Supp.2d 1, 5 (D.D.C.2002).

### A. Substantial Likelihood of Success on the Merits

"Section 13(d)(1) of the Securities Exchange Act (Act), 15 U.S.C. § 78m(d)(1), requires a stock purchaser to disclose acquisition of beneficial ownership of more than five per cent of a company's equity securities within ten days of purchase. The disclosure is filed on a Schedule 13D form." *SEC v. Bilzerian,* 29 F.3d 689, 692 n. 3 (D.C.Cir.1994). In addition, an amendment must be submitted promptly any time there is a "material change" in the facts set forth in the Schedule. 15 U.S.C. § 78m(d)(2). "The Schedule 13D mandates disclosure, inter alia, of the background and identity of the purchaser, the source and amount of funds for the purchase, the number of shares owned and of any plans to materially alter the target corporation's business or corporate structure (if the intent of the purchases is to obtain control)." *MITE Corp. v. Dixon,* 633 F.2d 486, 492 (7th Cir.1980).

Independence focuses its attention on Amendment Nos. 7, 8 & 9 to Mr. Bender's Schedule 13D, arguing that these reports were designed to increase his voting strength to block the Carver merger. In particular, the Bank asserts that these Amendments were untimely and intentionally misleading.[6]

---

**6.** The evidence and argument at the hearing on the application for a preliminary injunc-

tion covered alleged omissions or inaccuracies in more than Amendment Nos. 7, 8 & 9,

### 1. Untimeliness

The Bank assails Mr. Bender's failure, from and after March 15, 2004, and until May 24, 2004, to notify the market that the Bender Nominees had parted company with him and supported the Carver merger and would so vote their shares. It does not dispute that Amendment No. 10 fully clarified the points. While expressing skepticism over Mr. Hall's testimony that the Bender Nominees did not inform Mr. Bender of their votes, and Mr. Bender's testimony that he did not learn of those votes until receiving the instant complaint, the Bank offers no basis on which to discredit either witness. Mr. Hall credibly testified that he and Mr. Deckelbaum refrained from any discussion with Mr. Bender about the Bank's business or Board of Director activities because they had been admonished by the Bank's counsel that they should not discuss these matters with Mr. Bender.

Thus, the issue devolves to whether Mr. Bender had an obligation, as the holder of the Powers of Attorney and the actual signatory on the Amendments, by which he certified "reasonable inquiry," to *ask* Messrs. Deckelbaum and Hall about the accuracy of the statements in Amendment Nos. 7, 8 & 9. The Bank conceded at oral

argument that Powers of Attorney are frequently used in these circumstances and that the reasons given for the use of Powers of Attorney here—both Bender Nominees traveled and/or were in court frequently and unavailable to execute Amendments to the Schedule 13D—were legitimate and customary.

The record is clear (and the Amendments acknowledge) that Mr. Bender was purchasing Bank shares to position himself to block the Carver merger. By his testimony, each of the sellers called him and offered the shares to him. It is agreed that he paid the market rate.[7] Having been told by the Bender Nominees that they could not and would not share Board of Director information with him,[8] he made no inquiries of them. They, in turn, never called either Mr. Bender or a lawyer at Silver, Freedman & Taft to alert them to their change in position. The Bank argues that the market was confused by Amendment Nos. 7, 8 & 9 and the implicit suggestion that the Bender Nominees opposed the Carver merger. It suggests that sophisticated investors sold their shares to Mr. Bender in light of these Amendments because they foresaw litigation over the merger. No evidence supports this argument. It is curious that the unanimity of the Directors, now asserted to be critical

but the arguments of counsel and the briefs filed on behalf of the Bank make clear that the Bank attaches its request for remedies to those Amendments. In the interest of brevity of both opinion and time, the Court focuses where the Bank focused and will not belabor the other points. Specifically, Ms. Stewart complained that Mr. Bender waited a month before he disclosed that he had purchased 100 shares each for Messrs. Deckelbaum and Hall (a requirement for eligibility for a Board seat); three months before he provided a stingy description of his lack of success in getting a special shareholders meeting in Spring 2004; and six months before an amendment noted that the Bender Nominees had, in fact, been elected to the Board. None of these matters is material to Mr. Bender's purchase

of shares after the Board's merger agreement with Carver.

**7.** Prior to the talk of sale or merger, the Bank's stock traded at around $11.00 per share. In the spring of 2004, it hovered just under $21.00, the cash price offered by Carver.

**8.** Mr. Hall testified that he and Mr. Deckelbaum were "admonished" by securities counsel for the Bank to refrain from discussing any business of the Board of Directors with Mr. Bender. They each followed this advice, even after the vote to merge was announced by the Bank.

market information, was not announced by the Bank itself. In any event, it certainly would take only a majority of the Board members to vote in favor of the Carver transaction for the Bank to agree to it. It is difficult to conclude that the market would experience any surprise at information that the Bender Nominees might not have agreed to the merger, given previous filings. Indeed, the Bank offers nothing to support its argument.

Another curious aspect to the Bank's argument concerning timeliness is its assertion that Independence's current shareholders are the injured parties, despite the clarification of Amendment No. 10. The Bank contends that the current shareholders are the ones who did not figure out that the deal was in trouble in the spring of 2004 and that they will be forced to be involuntary partners to Mr. Bender's efforts to improve Bank operations if the Carver merger is defeated. This argument is, at its fundamentals, exactly opposite to the alleged market-confusion argument discussed above. The Bank initially claimed that the market was improperly confused because Amendment Nos. 7, 8 & 9 conveyed the erroneous impression that Messrs. Deckelbaum and Hall opposed the merger and implied that there might be litigation over the merger, a confusion not clarified until Amendment No. 10.[9] Its injured-shareholder argument suggests that Amendment Nos. 7, 8 & 9 prevented unsophisticated shareholders from realizing that the deal was in trouble and selling out in time, which, presumably, they might

have done with a more timely-filed Amendment No. 10. The alternative argument is no more successful than its predecessor.

The record is devoid of evidence that the statements in Amendment Nos. 7, 8 & 9 that may have temporarily conveyed the idea that Messrs. Hall and Deckelbaum would oppose the Carver merger had any impact on any investor's decision whether to hold, buy, or sell.[10] The arguments of the kinds of confusion or problems that these uncorrected Amendments might have caused do not demonstrate the point. The explicit language of the Amendments themselves attempted to distinguish the "Group" from "Mr. Bender," even though Mr. Bender did not know that any disagreement existed. The Court also finds that the continued filing as a Group was an innocent mistake, arising in part from counsel's admonition to Messrs. Deckelbaum and Hall not to share any information with Mr. Bender. Given the innocence of the error, and what appears to be a complete and clear correction in Amendment No. 10, the Court concludes that there is not a substantial likelihood that the Bank will succeed on this particular claim. In this regard, the Court notes that Amendment No. 10 was filed more than four months before the shareholder vote on the Carver merger, which should allow sufficient time for investors to make decisions on how to vote.

The alleged untimeliness of filing Amendment No. 10 to clarify that the Group had broken up and that Messrs.

---

9. It is noted that this litigation was brought by the Bank and not against it.

10. Amendment No. 7, which stated that no member of the Group had an intention to dispose of his shares, was not inaccurate as of the date of its filing because Mr. Hall and Mr. Deckelbaum had not, as of April 7, 2004, agreed to vote their shares in favor of the merger. Thus, even if Amendment Nos. 8 & 9

were suspect because Mr. Bender did not ascertain and report on their agreements to so vote, Amendment No. 7 does not present the same issue. The Court finds that Mr. Bender's acquisition of 65,000 shares of Bank stock on March 29, 2004, is not infected by any alleged failure to make timely filings and would not, on this theory, be neutralized in any event.

Deckelbaum and Hall supported the Carver merger and would vote their shares in favor does not support a preliminary injunction.

### 2. Disclosures

The Bank attacks Mr. Bender's Schedule 13D disclosures on two levels, asserting that Mr. Bender: (i) insufficiently revealed his plans for the Bank, and (ii) insufficiently reported that the Bender Nominees had voted in favor of the Carver merger and had plans to dispose of their stock through that merger.[11]

Section 13(d) was "designed as a broad disclosure provision to give shareholders and the market notice of potential changes in corporate control." *SEC v. First City Fin. Corp., Ltd.,* 688 F.Supp. 705, 724 (D.D.C.1988), *aff'd,* 890 F.2d 1215 (D.C.Cir. 1989). A Schedule 13D report reveals the background and identity of group members, their businesses, their source(s) of financing, their purposes in acquiring the stock, and their plans and intentions with respect to the issuer. Item 2 of Schedule 13D provides for the "identity and background" of the investor and group members, while Item 4 provides for the "purpose of [the] transaction," 17 C.F.R. § 240.13d–101. Within Item 4, Rule 13d–101 requires disclosure of any "plans or proposals" that would result in, *inter alia,* "[a]n extraordinary corporate transaction"; "[a]ny change in the present board of directors or management of the issuer"; or "[a]ny other material change in the issuer's business or corporate structure." *Id.* "Item 4 specifically requires disclosure of a purpose to acquire control, regardless of the definiteness or even the existence of

any plans to implement this purpose." *Chromalloy Am. Corp. v. Sun Chem. Corp.,* 611 F.2d 240, 247 (8th Cir.1979). The purpose of these disclosure rules is to provide investors with notice of a possible change in management or the direction of a business as it "may affect their judgment as to whether the stock should be sold, bought or held." *Marshall Field & Co. v. Icahn,* 537 F.Supp. 413, 416 (S.D.N.Y. 1982).

For the same reasons, § 13(d)(2) of the Exchange Act and Rule 13d–2, 17 C.F.R. § 240.13d–2, require that any person who has filed a Schedule 13D "promptly" amend the Schedule when a material change occurs in the facts. The parties agree on a traditional rule of thumb that the purchase of one percent (1%) or more of a corporation's stock constitutes a "material" change that must be reported by way of an amendment to a Schedule 13D. Beyond stock acquisition, other changes in the original information must be disclosed if a "reasonable investor" would " 'consider[ ] the information to be important ….' " *A.P. Green Indus., Inc. v. East Rock Partners, Inc.,* 726 F.Supp. 757, 761 (E.D.Mo.1989) (quoting *Missouri Portland Cement Co. v. H.K. Porter Co.,* 535 F.2d 388, 393 (8th Cir.1976)). Schedule 13D and any amendments must be complete and truthful. *SEC v. Savoy Indus., Inc.,* 587 F.2d 1149, 1165 (D.C.Cir.1978); *see also Dan River, Inc. v. Unitex Ltd.,* 624 F.2d 1216, 1227 (4th Cir.1980) ("[A] court is not to take a mechanical approach by refusing further inquiry into the plaintiff's allegations solely because the filing is facially adequate.").

---

11. There is an open issue in this Circuit as to whether an issuer of securities pursuant to § 12 of the Exchange Act has standing to sue for relief under § 13(d). *See Dan River, Inc. v. Unitex Ltd.,* 624 F.2d 1216, 1224 (4th Cir. 1980). Mr. Bender originally challenged the Bank's standing to bring these claims, but conceded standing for purposes of the application for a preliminary injunction.

### a. Plan for the Bank

In Amendment No. 10, Mr. Bender repeated his opposition to the Carver merger, restated his belief that "a change in the management and the composition of the board of directors ... is necessary" and announced his intention to "take action to effect such a change in the management and directors of the Issuer at any meeting of the Issuer's stockholders." Plfs.' Exh. 32 at 5. None of this was news. Mr. Bender's opinion on the Carver merger was first disclosed in Amendment No. 7, filed on April 7, 2004, when Mr. Bender informed investors that he had acquired an additional 65,000 shares on March 29, 2004, "to increase the level of Mr. Bender's voting rights" because he "does not support" the Carver transaction. *See* Plfs.'s Exh. 7 at 7. Mr. Bender's desire to change the composition of the Board of Directors of the Bank was first revealed in Amendment No. 2 filed on December 3, 2002. *See* Plfs.' Exh. 34. No later than Amendment No. 3, filed on April 25, 2003, Mr. Bender disclosed that he had "no confidence in the current board members and existing management . . . ." Plfs.' Exh. 38 at 8.

Nonetheless, the Bank argues that these disclosures have been insufficient and misleading. In discovery leading to the preliminary injunction hearing, Mr. Bender stated under oath that he would, if he controlled the Bank, replace its Chief Executive Officer, Chief Operating Officer, and outside accounting firm. He testified to other changes he might consider in the Bank's operations, such as a focus on commercial lending and better use of its stand-

ing as a minority institution to improve business with the federal government. Obviously, the statement in Amendment No. 10 that he would "take action to effect ... a change in the management" of the Bank was not as specific as the deposition testimony and the filings made only a few references to specific changes to operations. Plfs.' Exh. 32. The Bank argues that the situation presents a stark choice for its shareholders: to vote for the Carver merger, which will be fully disclosed, or to vote for Morton Bender, whose intentions are not fully disclosed.[12]

The Court does not agree. The sequence of the initial Schedule 13D and its eleven Amendments leaves little doubt as to the nature of Mr. Bender's intentions: if he could do so, he would replace all Board members except the Bender Nominees and he would change the management of the Bank and re-direct its business operations. The first Schedule 13D, filed on October 16, 2002, advised the market that the Bank could increase shareholder value "by cutting non-interest expenses, by maintaining or increasing the Issuer's capital and/or selling the Issuer." Plfs.' Exh. 3 at 4. Amendment No. 2 expanded on Mr. Bender's complaints about the Bank by advising the market that the Board had unjustly enriched a Bank officer through payment of a bonus and unjustly enriched itself by increasing Board fees when the Bank was not profitable. Plfs.' Exh. 34 at 4. Amendment No. 2 was also specific in relaying Mr. Bender's request to remove certain directors from the Board. *Id.* at 5. Amendment No. 3 kept up the drumbeat

---

12. The Bank asserts that the Schedule 13D "fails to disclose Bender's plan to obtain control of [the Bank] or the methodology to be used in achieving Bender's intended effect." Mem. of Pts. & Auths. in Supp. of Plfs.' App. for Prelim. Injunc. at 26. This is not correct. Mr. Bender's intention to effect a

change in control has been obvious since he announced his application to OTS for that purpose. His aim to vote out current directors and have the Bender Nominees elect new directors has also been revealed. *See* Plfs.' Exh. 39 at 7.

of disapproval of the Bank by Mr. Bender, reporting, *inter alia*, that he "continued to have no confidence in the current board members and existing management" and had filed a change-in-control application with the OTS. Plfs.' Exh. 38 at 8. Mr. Bender reported OTS approval of his change-in-control application in Amendment No. 4 in November 2003; he also expressed his lack of confidence and concern "with the decrease in the Issuer's return on average assets in each of the last four years and the Issuer's net losses for the last year and a half." Plfs.' Exh. 10 at 8. Amendment No. 6, filed December 22, 2003, was devoted almost exclusively to reporting on Mr. Bender's continuing efforts to replace the members of the Board of Directors. Plfs.' Exh. 39 at 7. The later Amendments addressed Mr. Bender's increasing stock positions and intentions to vote against the Carver merger.

If the "management" Mr. Bender targets refers to any one person, it must refer to the current leader of the Bank, *i.e.*, its CEO. The term obviously can also be construed more broadly, to include other Bank officials. Mr. Bender credibly testified that he does not have an identified candidate to replace the Bank's CEO and has not talked to anyone recently about nomination for the Board of Directors.[13] Thus, Mr. Bender has been candid that he wants to replace "management" and cannot now offer the name(s) of any alternatives without being unduly speculative. *See Todd Shipyards Corp. v. Madison Fund, Inc.*, 547 F.Supp. 1383,

1388 (S.D.N.Y.1982) (Identifying a potential board of directors nominee without firm plans to nominate him would be speculative and "might mislead investors into buying out of respect for [the person's] abilities when in fact there could be no assurances that he ultimately might seek a position on the Board."). Schedule 13D is not required to include "preliminary considerations, exploratory work or tentative plans;" it need only "disclos[e] . . . definite plans." *Azurite Corp. Ltd. v. Amster & Co.*, 844 F.Supp. 929, 934 (S.D.N.Y.1994). "A roughly sketched possible course of action" need not be disclosed. *Azurite Corp. Ltd. v. Amster & Co.*, 52 F.3d 15, 19 (2d Cir.1995).

It is very doubtful that shareholders have been misled in a material way about the choices before them. They can approve the Carver merger; they can vote against the merger and retain the status quo or search for another bid, through the current Board of Directors or any new elected Board; or they can vote against the merger and hope that Mr. Bender acquires control and changes management and the direction of the Bank.[14] In any event, it appears that Mr. Bender has adequately notified the market that he would change the "management" of the Bank.[15]

b. Position of Bender Nominees on Carver Merger

The Bank reserves its greatest attack on Amendment Nos. 7, 8 & 9 for their alleged failure to disclose that the Bender Nomi-

**13.** Mr. Bender proposed three men as Director nominees in December 2003 but has had no recent conversations with them to determine if they are still willing and interested.

**14.** Because of the "poison pill," Mr. Bender has not purchased new stock since May 6, 2005. He is now precluded from doing so by OTS, as he is precluded from advancing can-

didates for the Board of Directors at the Annual Meeting scheduled for September 29, 2004.

**15.** The Court agrees that the Bank's outside auditor is not "management" but finds that a failure to advise investors that Mr. Bender would replace the auditor would not affect a shareholder's decision to hold, buy or sell.

nees had voted in favor of the Carver Merger and then agreed to vote their stock in favor of the merger. This was the major point of the hearing on the application for a preliminary injunction.

As indicated above, the Court has no reason to discredit the consistent testimony of Messrs. Hall and Bender that the Bender Nominees never informed Mr. Bender of their votes in favor of the Carver merger or agreements to vote their stock in favor of the Carver merger. The questions presented are thus whether Mr. Bender failed to make a "reasonable inquiry" prior to signing these Amendments and whether the Amendments were misleading in a material way.

It is clear that there was *no* discussion between Mr. Bender and either of the Bender Nominees before Mr. Bender signed and filed Amendment Nos. 7, 8 & 9. The information was held by the Bender Nominees, not Mr. Bender, and they had shown an awareness of the necessity of reporting their own important Board activities on Schedule 13D. They had also informed Mr. Bender that they would not respond to any questions about their roles as Board members. The Powers of Attorney signed by Messrs. Hall and Deckelbaum authorized Mr. Bender to "sign any report filed pursuant to Schedule 13D ... and all amendments to any such documents" with "full power and authority to do and perform each and every act and thing requisite and necessary to be done ...." *See* Plfs.' Exhs. 7, 8 & 9. Under this set of circumstances, the Court finds that it was not unreasonable for Mr. Bender to assume that either Mr. Hall or Mr. Deckelbaum would contact him or counsel to alert them to any change in circumstances, as they had done earlier. Nonetheless, he certified that he had made a "reasonable inquiry" when, in fact, no inquiry of any kind was made. This factor

slightly supports the Bank's motion for a preliminary injunction.

Nonetheless, on this record, the Court finds it unlikely that Amendment Nos. 7, 8 & 9 were misleading in a material fashion that would cause a shareholder to decide whether to hold, sell or buy. It was evident from earlier Amendments to the Schedule 13D that Mr. and Mrs. Bender and Messrs. Hall and Deckelbaum were acting as a Group with common purposes. The two men were Mr. Bender's nominees for Board positions in the first place and he had purchased 100 shares of stock for both to make them eligible to serve on the Board (and had revealed that fact). Only a majority vote of the Board was necessary for approval of the Carver merger. When the Bank announced approval of that merger without revealing the unanimity of the vote, it is not unlikely that an observant shareholder would have concluded that there was disagreement at the Board level but that a majority approved the transaction. Anyone who had followed the developing dispute revealed by the Amendments would have assumed that the failure of unanimity would stem from the Bender Nominees, given Mr. Bender's stated aversion to the merger. And yet, the stock price jumped upon news of the merger without regard to the possibility of a minority position on the Board against the Carver deal.

Equally pertinent is that the Bender Nominees collectively control only 220 shares of Bank stock, hardly enough to make any difference in the final tally of shareholder votes on the merger.

If notice of a unanimous vote by the Board of Directors would have carried significance, the Bank itself would have trumpeted it or announced it as soon as it feared that Amendment Nos. 7, 8 & 9 were causing confusion in the marketplace, as opposed to consternation in the Board

room. Certainly, the Board controlled that information and could have done something about it if it were truly material.

Without *any* evidence of an impact on the marketplace, and with inaction on the Bank's part to cure an alleged error about which it alone had correct information, the Court concludes that the suggestion in Amendment Nos. 7, 8 & 9 that Messrs. Hall and Deckelbaum opposed the Carver merger probably was not and, for the reasons stated, would not have been material to shareholder decisions.[16]

The Bank's likelihood of success on the merits of its allegations that Mr. Bender failed to make material disclosures is very low.

### B. Irreparable Harm to the Bank

The second factor for analysis on an application for a preliminary injunction is a plaintiff's claims of irreparable harm. Section 13(d) cannot be used merely as a ploy to keep incumbent management safe from hostile takeover. Thus, the harm here cannot be to the individual members of the Board of Directors, who might be replaced if Mr. Bender has his way, or to the individual officers of the Bank who might be discharged. The harm must be to the institution, which in this case means irreparable harm to the Bank's shareholders.

The Court can find no irreparable harm to the shareholders from the alleged insuf-

ficiency of Mr. Bender's disclosures through the Schedule 13D or any of its Amendments, most particularly Amendment Nos. 7, 8 & 9. Whatever confusion may have existed has certainly been clarified through Amendment No. 10, in more than enough time for full notice and careful consideration by all shareholders as of the record date (August 9, 2004) for the shareholder vote. Notably, Amendment No. 10 was. filed in May 2004, long before the record date.

The Bank argues that its current shareholders are harmed because they will become involuntary partners with Mr. Bender as he tries to turn the Bank around over the next 18 months, if the Carver merger is rejected. These supposed unsophisticated investors allegedly were unable to sell and get out, when the getting was good, because they were confused or misled by the deficiencies in Mr. Bender's reports. This argument is, however, not self-evident [17] and no evidence supports it.

### C. Injury to Mr. Bender

On the other hand, the injury to Mr. Bender if the application is granted is obvious. The Bank seeks to neutralize the shares he has purchased since March 15, 2004 (8% of its outstanding stock) by requiring that it be deemed voted in favor and against the merger in the same proportion as all other votes are cast. This remedy is harsh.[18] It would entirely de-

---

**16.** This conclusion is buttressed by the fact that the Amendments distinguish Mr. Bender's intentions.

**17.** Before the adoption of the "poison pill," Mr. Bender purchased Bank shares on the open market at the market price. Any shareholder may have offered to sell to him, since his interest was open and notorious. If Mr. Bender focused on purchasing large amounts of stock rather than small holdings, as the Bank argues, that fact is not relevant to the disclosure issues here. Since adoption of the

poison pill, Mr. Bender has been unable to buy shareholder stock because the Bank has effectively moved to stop him. OTS has since added its voice to the discussion. Neither of these events precludes shareholders from selling on the open market, although they did remove an interested buyer.

**18.** Having reviewed the case law on the question, the Court discounts the testimony of expert witness Rosemary Stewart that neutralization of shares is a customary remedy for § 13(d) violations. Even the Bank's cited

prive Mr. Bender of his rights as a shareholder for the stock he most recently acquired and prevent him from engaging in shareholder democracy. This factor weighs against a preliminary injunction.

### D. Public Interest

Having determined that there is not a substantial likelihood that the Bank will prevail on the merits of its claims that Mr. Bender has violated § 13(d) of the Exchange Act, the Court concludes that it is in the public interest that the future of the Bank be decided by all of its shareholders as of August 9, 2004.

### III. Conclusion

"[T]he issuance of a preliminary injunction prior to a full trial on the merits is 'an extraordinary and drastic remedy[,]'" which the circumstances here do not warrant. *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C.Cir.1980) (quoting *Medical Society v. Toia*, 560 F.2d 535, 538 (2d Cir. 1977)). The application for a preliminary injunction barring Morton Bender from personally voting all of his shares at the upcoming shareholder meeting, and enjoining further violations of § 13(d), is denied.

**SO ORDERED.**

cases do not support her testimony in this regard.